### FLEET AEROSPACE CORPORATION, Plaintiff,

v.

**Mark HOLDERMAN, Acting Commissioner and Chief of Securities for Division of Commerce; Kenneth Cox, Director of Commerce, Department of Commerce; Aeronca, Inc.; and The State of Ohio, Defendants.**

**No. C–2–86–0556.**

United States District Court, S.D. Ohio, E.D.

June 11, 1986.

744

John J. Chester, Roderick H. Willcox, J. Anthony Kington, Chester, Hoffman & Willcox, Columbus, Ohio, for plaintiff.

John W. Zeiger, Erwin N. Griswold, John W. Edwards, II, H. Theodore Meyer, Leigh B. Trevor, Jones, Day, Reavis & Pogue, Columbus, Ohio and Sylvia B. Robbins-Penniman, Asst. Atty. Gen., for the State defendants.

James M. Hall, Jr., David L. Johnson, Taft, Stettinius & Hollister, Columbus, Ohio, for defendant Aeronca.

## MEMORANDUM AND ORDER

HOLSCHUH, District Judge.

### I. INTRODUCTORY

This case presents a direct challenge to the constitutionality of Ohio legislation enacted in response to the Supreme Court's decision in *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), which "sounded the death knell for state control of federally regulated tender of-fers."[1] The Ohio Control Share Acquisition Act attempts to restrict federally regulated tender offers in a different manner and to a different degree than the "first generation" of such state statutes but, as discussed below, the state statute in question still has an unconstitutional effect. All courts to date that have considered similar control share acquisition acts have' held them to be unconstitutional, as does this Court in the opinion that follows. After careful consideration of the evidence presented and the arguments of the parties, the Court is left with the firm opinion that the Ohio legislation in question runs afoul of both the Supremacy Clause and the Commerce Clause of the Constitution and is, therefore, unenforceable.

### II. PROCEDURAL HISTORY

Plaintiff Fleet Aerospace Corporation (Fleet) brought this action on May 21, 1986, seeking declaratory and injunctive relief to bar enforcement of Ohio Rev.Code §§ 1707.041, 1707.23, and 1707.26 (the Ohio Takeover Act and its enforcement statutes), § 1707.042 (an anti-fraud statute), and Ohio Rev.Code § 1701.831 (the Ohio Control Share Acquisition Act). Plaintiff sought to have these statutes declared unconstitutional in relation to its cash tender offer for shares of common stock of defendant Aeronca, Inc. as violative of Article I, § 8, cl. 3 (the Commerce Clause) and Article VI, cl. 2 (the Supremacy Clause) of the United States Constitution. This Court's jurisdiction has been invoked pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337(a) and 1343(a).

On May 21, 1986 this Court granted plaintiff's motion for a temporary restraining order against defendants Mark Holderman, acting commissioner and chief of securities for the Ohio Division of Securities, and Kenneth Cox, director of commerce for the Ohio Department of Commerce, with respect to Ohio Rev.Code §§ 1707.041, 1707.042, 1707.23, and 1707.26 and against

---

**1.** Kreider, *Fortress Without Foundation? Ohio*  *Takeover Act II,* 52 Cin.L.Rev. 108, 108 (1983).

defendant Aeronca with respect to Ohio Rev.Code §§ 1707.041, 1707.042, 1707.23, 1707.26, and 1701.831. The Order was clarified by a subsequent Order dated May 23, 1986. On June 2, 1986 the temporary restraining order was continued until 4:00 p.m. on June 11, 1986. At the beginning of the hearing on plaintiff's motion for a preliminary injunction held on June 2 and 3, 1986, the Court permitted the State of Ohio to intervene in the action. It also dismissed plaintiff's claims with respect to Ohio Rev.Code § 1707.041 on the ground of mootness. On June 2, 1986 defendant Aeronca filed a motion for a preliminary injunction to enjoin plaintiff from purchasing any of defendant's shares until plaintiff complied with Ohio Rev.Code § 1701.831. The following constitutes the findings of this Court as to the various issues raised by the parties in their motions and at the hearing of this matter.[2]

### III. STATEMENT OF FACTS

Plaintiff Fleet is incorporated under the laws of Ontario, Canada and has its principal executive offices in St. Catharines, Ontario, Canada. It is engaged in the manufacture of components and subsystems for the aerospace and marine industries. Defendant Aeronca is incorporated under the laws of Ohio with its principal executive offices in Charlotte, North Carolina. Its principal business is located in Middletown, Ohio and involves manufacturing and supplying components to the aerospace industries.

Defendant Aeronca's stock is registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 and is actively traded on the American and Pacific Stock Exchanges. According to the affidavit of Victor LaTessa, a trust officer of Ameritrust Co., as of May 19, 1986 there existed 2,741 shareholders of record of the common stock of defendant Aeronca. Four hundred and thirty-three (433) of these shareholders have record addresses in the State of Ohio.

The records also indicate that 2,989,161 common shares of defendant Aeronca were issued and outstanding as of May 19, 1986 and at least 106,276 of these shares were held by shareholders with Ohio addresses.

On May 21, 1986 plaintiff commenced a nationwide tender offer for any and all shares of common stock of defendant Aeronca at a price of $5 per share which, at the time, was above the current market price being offered for the stock. On the same day plaintiff filed the present action in this Court.

### IV. EVIDENTIARY RULINGS

As an initial matter, several issues must be resolved prior to ruling on the cross motions for a preliminary injunction. Each of these issues is discussed below.

### A. TESTIMONY OF ATTORNEY JAMES M. TOBIN

At the preliminary injunction hearing, the state defendants called attorney James M. Tobin as an expert witness as to practices which occur in the tender offer area. Plaintiff objected to Mr. Tobin's testimony on the ground that practices under a tender offer were not relevant to the present controversy. Plaintiff stated it was not objecting to Mr. Tobin's qualifications as an expert witness and that it would stipulate that Mr. Tobin was knowledgeable in the area of tender offers.

While it may be conceded that Mr. Tobin is qualified by his experience as a practicing attorney to render opinions regarding the specialized area of corporate law practice dealing with tender offers, it is obvious that as a member of the Advisory Board of the Ohio Division of Securities and chairman of its tender offer advisory group, and as chairman of the Ohio State Bar Association's tender offer subcommittee which conceived, drafted and supported the Ohio Control Share Acquisition Act, Mr. Tobin clearly is not a disinterested witness in

---

**2.** On June 9, 1986 the Court received a motion of the Ohio Manufacturers Association for leave to file an attached memorandum amicus curiae. The motion is granted and the argument raised in that brief has been considered by the Court.

terms of the ultimate issue of the constitutionality of that Act. Although the Court has the highest regard for Mr. Tobin, it appeared to the Court that his testimony was framed more as an advocate's argument in support of the constitutionality of the legislation than as an expert's opinion regarding any factual issues to be resolved by the Court. Finally, while Mr. Tobin is clearly entitled to his own views of the effects of cash tender offers, based upon his own experience, those views are of little consequence when they conflict with the basic premises underlying Congress' enactment of the Williams Act. The Court, while overruling plaintiff's objection as to the relevancy of Mr. Tobin's testimony, has taken these matters into consideration in arriving at the weight to be given Mr. Tobin's testimony in resolving the ultimate issue of the constitutionality of the Ohio Control Share Acquisition Act.

## B. THE AFFIDAVIT OF JOHN J. GAVIN

■ At the same hearing, plaintiff offered into evidence plaintiff's exhibit B. Exhibit B is the affidavit of John J. Gavin, an executive vice president of D.F. King and Co., Inc., the information agent for plaintiff. The affidavit is submitted for the avowed purpose of showing that a preponderance of the shares of common stock of Aeronca is held by persons residing outside the State of Ohio.

The state defendants and Aeronca objected to the admissibility of exhibit B on the ground that it was delivered outside the requirements of Fed.R.Civ.P. 6. The defendants also objected to the substance of the affidavit, which allegedly contains unsubstantiated hearsay and "secret information" that should not be given any weight by this Court.

Fed.R.Civ.P. 6(d) requires that when a motion is supported by an affidavit, the affidavit shall be served with the motion. The rule further requires that opposing affidavits may be served not later than one (1) day before the hearing, "unless the court permits them to be served at some

other time." Fed.R.Civ.P. 6(d). The Court can discern no significant prejudice to the defendants by permitting the affidavit of Mr. Gavin to have been served upon them at the hearing.

The reason there is no prejudice to the defendants is because Mr. Gavin's affidavit corresponds to the affidavit of Victor LaTessa, admitted as defendant Aeronca's exhibit 3. Both affidavits attempt to identify the domicile of shareholders of Aeronca common stock. Both affidavits tend to show that a substantial amount of Aeronca common stock is held by residents of states other than Ohio. In fact, although Mr. Gavin concludes that at least 41.4 percent is held by nonresidents of Ohio, Mr. LaTessa's affidavit states that only 15.79 percent of Aeronca's shareholders have record addresses in the state of Ohio.

The defendants object to the admissibility of exhibit B on the ground that it contains unsupported hearsay and "secret information." The defendants acknowledge the different standards to be used in determining the admissibility of an affidavit submitted in support of a Fed.R.Civ.P. 65 preliminary injunction as opposed to an affidavit in support of a Fed.R.Civ.P. 56 summary judgment motion, *see* Wright & Miller, 11 Federal Practice and Procedure § 2949, but argue that exhibit B should be given no weight. In the context of a Rule 65 motion, the Court finds that exhibit B is admissible, and, therefore, defendants' objection to the admission of plaintiff's exhibit B is overruled.

## C. THE AFFIDAVIT OF HAROLD M. WILLIAMS

■ The state defendants requested that the record of the hearing be held open for the purpose of submitting an affidavit of Harold M. Williams, president and chief executive officer of the J. Paul Getty Trust and a former chairman of the Securities and Exchange Commission. Because of the severe time constraints resulting from the need to rule on the plaintiff's motion for preliminary injunction by June 11, 1986, and for the reasons stated from the bench,

the Court closed the record at the conclusion of the hearing on June 3, 1986, but without prejudice to the defendants moving to reopen the record for this purpose after Mr. Williams' affidavit had been obtained. Defendants subsequently filed such a motion and tendered the June 5, 1986 affidavit of Mr. Williams.

Although the Court grants defendants' motion and will consider the affidavit of Mr. Williams as a part of the record, it is, for the most part, an expression of Mr. Williams' personal view that "the ever-present threat of takeovers imposes costs upon the economy, which generally cannot be quantified but which are nevertheless real and substantial." He believes that management's fear of takeovers has adverse effects on the efficiency and productivity of a corporation and that "these effects are contrary to the long-term goals of this nation and undermine our economic strength at a time when our competitiveness in world markets is already dangerously impaired." The affidavit is primarily an argument that "the takeover phenomenon of the last decade" has not been good for this nation's economy and, indeed, has had harmful effects, but this is an argument that more properly should be addressed to Congress in support of curtailment of interstate tender offers. In resolving the present constitutional issues, it is not the function of this Court to decide whether tender offers have a "good" or "bad" effect on the nation's economy.

Mr. Williams also expresses his opinion that the OCSAA "will support precisely the type of informed consideration by shareholders of long-term corporate goals and interests that is necessary to this nation's economic well-being." While the Court respects Mr. Williams and appreciates the sincerity of his viewpoint toward the effect of tender offers on the nation's economy, his affidavit primarily advocates a national economic policy position and is of little aid to the Court in resolving the specific constitutional issues raised by the Ohio Control Share Acquisition Act.

## V. THE ANTI–FRAUD PROVISIONS OF OHIO REV.CODE § 1707.042

■ Plaintiff moves for a preliminary injunction enjoining the state defendants and defendant Aeronca from enforcing the provisions of Ohio Rev.Code § 1707.042,[3] which is an anti-fraud provision relating to control bids.[4] Section 1707.042 forbids any person making or opposing a control bid

---

**3.** Ohio Rev. Code § 1707.042 [Prohibitions relating to control bids.]
  (A) No person who makes or opposes a control bid to offerees in this state shall knowingly do any of the following:
    (1) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;
    (2) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any such offeree;
    (3) Engage in any manipulative act or practice.
  (B) Any person who makes or opposes a control bid to offerees in this state shall be conclusively presumed to have designated the secretary of state as its agent for the service of process in any action or proceeding under Chapter 1707. of the Revised Code. Upon receipt of any such process, together with an affidavit showing the last known address of the person who made or opposed the control bid, the secretary of state shall forthwith give notice by telegraph of the fact of the service of process and forward a copy of such process

to such address by certified mail, with a request for return receipt. This section does not affect any right to serve process in any other manner permitted by law.
  (C) Any person who makes or opposes a control bid is subject to the liabilities and penalties applicable to a seller, and an offeree is entitled to the remedies applicable to a purchaser, as set forth in section 1707.41 to 1707.45 of the Revised Code.
  (D) In case any provision or application of any provision of this section is for any reason held to be illegal or invalid, such illegality or invalidity shall not affect any legal and valid provision or application of this section.

**4.** Ohio Rev. Code 1707.042 was enacted at the same time as the Ohio Control Share Acquisition Act but was included in the statutes dealing with regulation of securities transactions and immediately follows Ohio Rev. Code 1707.041, the Ohio Takeover Act. Ohio Rev. Code 1701.-831, the Ohio Control Share Acquisition Act, was included in the statutes dealing with regulation of Ohio corporations, consistent with the argument that such legislation is meant to regulate the internal affairs of Ohio corporations.

from (1) making any untrue statement of material fact, or any omission of a material fact that would make a statement not misleading; (2) engaging in any act, practice, or course of business which operates as a fraud or deceit upon any offeree; or (3) engaging in any manipulative act or practice. A violation of the provisions of section 1707.042 subjects a person to criminal prosecution under Ohio Rev.Code § 1707.-23(E) [5] and injunctive relief under section 1707.23(H).[6] Plaintiff contends that the anti-fraud provision is an unconstitutional burden on interstate commerce in violation of the Commerce Clause because it may operate to delay, and perhaps defeat, a tender offer made in interstate commerce. Plaintiff argues that the requirements of section 1707.042 impose additional costs and burdens on a tender offeror and, therefore, unconstitutionally burden interstate commerce. Finally, plaintiff contends that the Ohio anti-fraud provisions violate the Supremacy Clause because Section 14(e) of

the Exchange Act, 15 U.S.C. § 78n(e), provides the exact same protection to all shareholders as that which is provided to Ohio resident shareholders by the Ohio statute.

The threshold question presented by plaintiff's motion concerning section 1707.-042 is whether there is a live case or controversy presented sufficient to confer subject matter jurisdiction on this Court. Article III of the Constitution of the United States requires that parties seeking to invoke the power of federal courts must allege an actual case or controversy. *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Brown v. Ferro Corp.,* 763 F.2d 798, 801 (6th Cir.1985). Federal courts are without power to resolve disagreements, whatever their nature, that fail to meet this jurisdictional prerequisite. *Flast v. Cohen,* 392 U.S. 83, 96–97, 88 S.Ct. 1942, 1950–51, 20 L.Ed.2d 947 (1968); *Community for Creative Non-*

---

**5.** Ohio Rev. Code § 1707.23(E). Enforcement powers of division of securities.

Whenever it appears to the division of securities, from its files, upon complaint, or otherwise, that any person has engaged in, is engaged in, or is about to engage in any practice declared to be illegal or prohibited by Chapter 1707. of the Revised Code, or defined as fraudulent in such chapter, or any other deceptive scheme or practice in connection with the sale of securities, or when the division believes it to be in the best interest of the public and necessary for the protection of investors, the division may:

(E) Initiate criminal proceedings under section 1707.042 [1707.04.2] or 1707.44 of the Revised Code by laying before the prosecuting attorney of the proper county any evidence of criminality which shall come to its knowledge; and in the event of the neglect or refusal of the prosecuting attorney to prosecute such violations, or at the request of the prosecuting attorney, the division shall submit such evidence to the attorney general, who may proceed in the prosecution with all the rights, privileges, and powers conferred by law on prosecuting attorneys, including the power to appear before grand juries and to interrogate witnesses before such grand juries.

**6.** Ohio Rev. Code § 1707.23(H). Enforcement powers of division of securities.

Whenever it appears to the division of securities, from its files, upon complaint, or otherwise, that any person has engaged in, is engaged

in, or is about to engage in any practice declared to be illegal or prohibited by Chapter 1707. of the Revised Code, or defined as fraudulent in such chapter, or any other deceptive scheme or practice in connection with the sale of securities, or when the division believes it to be in the best interest of the public and necessary for the protection of investors, the division may:

(H) Issue and cause to be served by certified mail upon all persons affected an order requiring the person or persons to cease and desist from the acts or practices appearing to the division of securities to constitute violations of Chapter 1707. of the Revised Code. The order shall state specifically the section or sections of Chapter 1707. of the Revised Code that appear to the division of securities to have been violated and the facts constituting the violation. If after the issuance of the order it appears to the division of securities that any person or persons affected by the order have engaged in any act or practice from which the person or persons shall have been required, by the order, to cease and desist, the director of commerce may apply to the court of common pleas of any county for, and upon proof of the validity of the order of the division of securities, the delivery of the order to the person or persons affected, and of the illegality and the continuation of the acts or practices that are the subject of the order, the court may grant an injunction implementing the order of the division of securities.

*Violence v. Hess,* 745 F.2d 697, 700 (D.C. Cir.1984). Thus, "[t]he mere *potential* for future injury ... is insufficient to render an issue ripe for review." *MCI Cellular Tele. Co. v. F.C.C.,* 738 F.2d 1322, 1333 (D.C.Cir.1984) (quoting *Alascom, Inc. v. F.C.C.,* 727 F.2d 1212, 1217 (D.C.Cir.1984) (emphasis in original)).

In the present case, there has been no allegation that plaintiff has committed any act in violation of the anti-fraud prohibitions codified in section 1707.042. There is nothing in the record to even suggest that the state defendants or Aeronca have any cause to invoke section 1707.042.[7] This Court is being asked to render an advisory opinion concerning the constitutionality of an Ohio statute when, in fact, that statute may never be the cause for any action between the parties to this lawsuit. A court is under a constant duty to examine its subject matter jurisdiction and where jurisdiction is lacking, a court must *sua sponte* dismiss a claim or case. The plaintiff's motion for an injunction against enforcement of section 1707.042 of the Ohio Revised Code fails to present a case or controversy sufficient to confer jurisdiction upon this Court; accordingly, the plaintiff's claim that section 1707.042 is unconstitutional is hereby DISMISSED, without prejudice to renewal of the claim in the event the defendants attempt to invoke that section against plaintiff in connection with plaintiff's tender offer.

## VI. STANDARDS FOR THE PARTIES' CROSS MOTIONS FOR PRELIMINARY INJUNCTIONS

This Court has dismissed, without prejudice, plaintiff's claims under Ohio Rev.Code §§ 1707.041 and 1707.042. Plaintiff's motion is therefore now limited to whether a preliminary injunction should issue enjoining the enforcement of Ohio Rev.Code § 1701.831. In its cross motion for preliminary injunction, defendant Aeronca has moved to require plaintiff to comply with the provisions of this statute.

A motion for injunctive relief must be tested against the prerequisites as set forth in *Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir. 1977):

(1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits;

(2) whether the movant has shown irreparable injury;

(3) whether the issuance of a preliminary injunction would cause substantial harm to others; and

(4) whether the public interest would be served by issuing a preliminary injunction.

A party moving for a preliminary injunction must prevail on all four of the above-stated elements before an injunction will be granted.

After careful consideration, and for the reasons more fully explained in this Order, it is the decision of this Court that plaintiff Fleet has met its burden and that a preliminary injunction will therefore issue against defendants' enforcement of O.R.C. § 1701.-831.[8]

Because plaintiff Fleet has established a strong or substantial likelihood or probabil-

---

7. In contrast, plaintiff is presently in violation of the requirements of the Ohio Control Share Acquisition Act by failing to deliver to defendant Aeronca an "acquiring person statement," and plaintiff's tender offer states that it is being made without compliance by plaintiff with certain takeover statutes, including the Ohio Control Share Acquisition Act and the Ohio Takeover Act.

8. The defendants reliance on *CEIC Holding Co. v. Cincinnati Equitable Insurance Co.,* Case No. C–1–84–1587 (S.D.Ohio, W.Div. Nov. 8, 1984) in support of their claim that plaintiff has failed to

establish irreparable harm or likelihood of success on the merits does not alter this Court's conclusion.

In *CEIC* plaintiff, contemporaneous with its commencement of a tender offer, filed suit in the Western Division of the Southern District of Ohio seeking a declaration that O.R.C. §§ 1707.-041 and 1701.831 were unconstitutional under the Commerce Clause and Supremacy Clause of the United States Constitution and seeking an injunction to enjoin the state of Ohio and target company from enforcing these Ohio statutes. The court granted plaintiff's motion for a temporary restraining order in regard to the timing

ity that O.R.C. 1701.831 is unconstitutional, it is also clear that defendant Aeronca has failed to meet its burden on this prerequisite for injunctive relief and its motion must therefore be denied.

provision of O.R.C. § 1707.041. It denied plaintiff's motion in all other respects, finding that plaintiff had failed to establish irreparable harm or a substantial likelihood of success on the merits.

In *CEIC* the target company was an Ohio based corporation with ninety percent (90%) of its outstanding shares held by Ohio residents. The plaintiff was also an Ohio based corporation. Judge Spiegel relied heavily upon this fact in deciding plaintiff had failed to show that the indirect burden of the Ohio statute outweighed its local benefits. *Id.* at p. 10. The Court further found that it "did not perceive a serious conflict with federal statutes or regulations warranting injunctive relief at this time." *Id.* at p. 11.

In the present case, this Court has conducted an evidentiary hearing on the plaintiff's motion for preliminary injunction, has received exhaustive briefs from all parties and has the added benefit of relevant case law decided since Judge Speigel denied, in part, the motion for a temporary restraining order in the *CEIC Holding Co.* case. Aside from marked factual differences in the two cases, the Court does not believe that the denial, in part, of a temporary restraining order by another Judge of this Court, constitutes controlling precedent with regard to the constitutional issues presented in this case by plaintiff's motion for preliminary injunction.

9. Ohio Rev. Code § 1701.831 [Procedure for control share acquisitions.]

(A) Unless the articles or the regulations of the issuing public corporation provide that this section does not apply to control share acquisitions of shares of such corporation, any control share acquisition of an issuing public corporation shall be made only with the prior authorization of the shareholders of such corporation in accordance with this section.

(B) Any person who proposes to make a control share acquisition shall deliver an acquiring person statement to the issuing public corporation at the issuing public corporation's principal executive offices. Such acquiring person statement shall set forth all of the following:

(1) The identity of the acquiring person;

(2) A statement that the acquiring person statement is given pursuant to this section;

(3) The number of shares of the issuing public corporation owned, directly or indirectly, by the acquiring person;

(4) The range of voting power, described in division (Z)(1)(a), (b), or (c) of section 1701.-01 of the Revised Code, under which the pro-

## VII. THE OHIO CONTROL SHARE ACQUISITION ACT, OHIO REV.CODE § 1701.831 (OCSAA)

Ohio Rev.Code § 1701.831[9] is part of Ohio's corporation code and is applicable to all Ohio corporations with fifty or more

posed control share acquisition would, if consummated, fall;

(5) A description in reasonable detail of the terms of the proposed control share acquisition;

(6) Representations of the acquiring person, together with a statement in reasonable detail of the facts upon which they are based, that the proposed control share acquisition, if consummated, will not be contrary to law, and that the acquiring person has the financial capacity to make the proposed control share acquisition.

(C) Within ten days after receipt of an acquiring person statement that complies with division (B) of this section, the directors of the issuing public corporation shall call a special meeting of shareholders of the issuing public corporation for the purpose of voting on the proposed control share acquisition. Unless the acquiring person agrees in writing to another date, such special meeting of shareholders shall be held within fifty days after receipt by the issuing public corporation of the acquiring person statement. If the acquiring person so requests in writing at the time of delivery of the acquiring person statement, such special meeting shall not be held sooner than thirty days after receipt by the issuing public corporation of the acquiring person statement. Such special meeting of shareholders shall not be held later than any other special meeting of shareholders that is called, after receipt by the issuing public corporation of the acquiring person statement, in compliance with section 1701.76, 1701.78, 1701.79, 1701.83, or 1701.831 [1701.83.1] of the Revised Code.

(D) Notice of the special meeting of shareholders shall be given as promptly as reasonably practicable by the issuing public corporation to all shareholders of record as of the record date set for such meeting, whether or not entitled to vote thereat. Such notice shall include or be accompanied by both of the following:

(1) A Copy of the acquiring person statement delivered to the issuing public corporation pursuant to this section;

(2) A statement by the issuing public corporation, authorized by its directors, of its position or recommendation, or that it is taking no position or making no recommendation, with respect to the proposed control share acquisition.

(E) The acquiring person may make the proposed control share acquisition if both of the following occur:

shareholders that have a principal place of business, principal executive offices, or substantial assets within Ohio. Ohio Rev. Code § 1701.01(Y).[10] A very unusual statute enacted at the same time, Ohio Rev. Code § 1701.832,[11] consists entirely of

(1) The shareholders of the issuing public corporation who hold shares of such corporation entitling them to vote in the election of directors authorize such acquisition at the special meeting held for that purpose at which a quorum is present by an affirmative vote of a majority of the voting power of such corporation in the election of directors represented at such meeting in person or by proxy, and a majority of the portion of such voting power excluding the voting power of interested shares. A quorum shall be deemed to be present at such special meeting if at least a majority of the voting power of the issuing public corporation in the election of directors, and a majority of the portion of such voting power excluding the voting power of interested shares is represented at such meeting in person or by proxy.

(2) Such acquisition is consummated, in accordance with the terms so authorized, not later than three hundred sixty days following shareholder authorization of the control share acquisition.

[F](G) Except as expressly provided in this section, nothing in this section shall be construed to affect or impair any right, remedy, obligation, duty, power, or authority of any acquiring person, any issuing public corporation, the directors of any acquiring person or issuing public corporation, or any other person under the laws of this or any other state or of the United States.

10. Ohio Rev. Code § 1701.01(Y). Definitions. As used in sections 1701.01 to 1701.98 of the Revised Code, unless the context otherwise requires:

(Y) "Issuing public corporation" means a domestic corporation with fifty or more shareholders that has its principal place of business, principal executive offices, or substantial assets within this state, and as to which no valid close corporation agreement exists under division (H) of section 1701.591 [1701.59.-1] of the Revised Code.

11. Ohio Rev. Code § 1701.832 [Purpose and effect of Am.Sub.H.B. 822.]

(A) In amending section 1701.01, 1701.11, 1701.37, 1701.48, 1707.01, 1707.23, 1707.26, 1707.29, and 1707.99 and in enacting sections 1701.831 [1701.83.1] and 1707.042 [1707.04.2] of the Revised Code, the General Assembly finds:

(1) Existing Ohio corporate law was designed to deal with traditional methods of transfer of control of Ohio corporations. The tender offer has evolved as an alternative device to acquire control of a public corporation that has been in widespread use in the past several decades. The acquisition of significant blocks of the securities of a public company in the open market or private transactions in connection with actual or apparent efforts to acquire control has become more common in recent years and has further complicated the impact of tender offers upon a corporation and its shareholders. Numerous Ohio corporations have been the subject of tender offers and accumulations of significant blocks of securities.

(2) The accumulation of a large block of a corporation's voting shares, or other securities convertible into voting share, through direct or indirect acquisition from one or more existing shareholders of such corporation has not been subject to the normal corporate approval mechanisms involved in other typical types of acquisition transactions such as mergers, consolidations, combinations and majority share acquisitions. Such accumulations, however, can result in shifts of effective corporate control and hence, from a business and financial perspective, directly or indirectly, can result in significant changes in a variety of basic corporate circumstances identical or substantially similar to those arising as a result of the above-mentioned transactions. For instance, a change in corporate control accompanying a large accumulation of shares will very often result in a fundamental change in the ongoing business of the corporation and a concomitant fundamental change in the nature of the shareholders' investment in it. Thus the potential that such changes in corporate circumstances will occur gives rise to basic issues concerning the internal affairs of the corporation typical of those arising in mergers, consolidations, combinations and majority share acquisitions. The form of the transaction in which such issues arise should not alter the basic corporate mechanisms by which such issues are presented and resolved.

(3) Tender offers almost always involve a change in corporate control and, therefore, give rise to these same basic issues concerning internal corporate affairs. Although tender offers in theory offer shareholders the opportunity to consider such issues in deciding whether or not to tender their shares, in practice they do not. Tender offers are coercive in the sense that shareholders are normally concerned that a majority of their fellow shareholders will tender their shares, leaving them in a minority position with one controlling shareholder. Thus, shareholders often feel compelled to tender their shares, regardless of how they feel about the corporate control issues inherent in any tender offer.

"findings" by the General Assembly of Ohio regarding a tender offer and an accumulation of a large block of a corporation's voting shares with a "potential" for "significant changes in a variety of basic corporate circumstances" involving "the internal affairs of the corporation." [12] The OCSAA governs "control share acquisitions," and applies not only to tender offers but also to open market purchases and privately negotiated block transactions if a certain level of voting power would be attained as a result of the transaction. Ohio Rev.Code § 1701.01(Z)(1).[13] A person proposing to

The opportunity for reasoned decision-making is further hindered by the short time periods in which tender offers can be consummated, the structures of many recent tender offers, which are designed to encourage prompt tenders, and the fact that individual shareholders typically receive or obtain tender offer materials much later than institutional shareholders.

(4) It is in the public interest for shareholders to have a reasonable opportunity to express their views by voting on a proposed shift of control, an opportunity currently available under Ohio corporation law in transactions with similar effects. The General Assembly also believes that it is in the public interest for Ohio securities laws to provide evenhanded protection of offerors and shareholders from fraudulent and manipulative transactions arising in connection [with] control acquisitions.

(5) Initial state efforts to deal with tender offer developments have been questioned by the federal courts. The General Assembly observes that responsibility for general corporate laws is the function of state legislation and that no federal law of corporations exist. The General Assembly observes that securities law protection of state residents has long been recognized as an appropriate subject of state law regulation under the federal system. The General Assembly acknowledges an in loco parentis responsibility to shareholders who invest in corporations created under the laws of Ohio and to shareholders generally who reside in Ohio.

(B) Section 1701.01, 1701.11, 1701.37, 1701.48, 1707.01, 1707.23, 1707.26, 1707.29, and 1707.-99, as amended by this act, and section 1701.-831 [1701.83.1] and 1707.042 [1707.04.2], as enacted by this act, are a recognition of the state's responsibility with respect to the subject matter of the act. Nevertheless, with a view to avoiding an undue burden on interstate commerce, as expressed in recent court decisions, the amendments are designed to have the minimum impact upon such commerce consistent with Ohio responsibility in respect to the subject matter. Accordingly, the security law in sections 1707.23, 1707.26, 1707.29 and 1707.99 and in newly enacted section 1707.042 [1707.04.2] of the Revised Code are limited to application to Ohio resident investors, and the corporate law amendments in sections 1701.11, 1701.37, and 1701.-48 and in newly enacted section 1701.831 [1701.83.1] of the Revised Code are limited to

corporations created under the laws of Ohio with the strong Ohio ties proved in the amendments. The corporate legislation does not include a requirement for Ohio resident investors because of the difficulty of ascertainment by potential acquirers and others of the residence of shareholders. The General Assembly finds that corporations containing the jurisdictional nexus provided by the amendments may be deemed to have a substantial and significant shareholder base in the state.

12. Ohio Rev.Code § 1701.832 recites, among other things, that "initial state efforts to deal with tender offer developments have been questioned by the federal courts," an obvious reference to the Supreme Court's decision in the *MITE* case. The "internal affairs" argument, however, in the context of such statutes placing an impermissible burden on interstate commerce, was rejected by the Supreme Court in *MITE,* has been rejected by other courts in relation to statutes similar to Ohio's Control Share Acquisition Act and, as noted later in this opinion, is rejected by this Court as well.

13. Ohio Rev.Code § 1701.01(Z)(1). Definitions. As used in section 1701.01 to 1701.98 of the Revised Code, unless the context otherwise requires:

(Z)(1) "Control share acquisition" means the acquisition, directly or indirectly, by any person, of shares of an issuing public corporation that, when added to all other shares of the issuing public corporation in respect of which such person may exercise or direct the exercise of voting power as provided in this division, would entitle such person, immediately after such acquisition, directly or indirectly, alone or with others, to exercise or direct the exercise of the voting power of the issuing public corporation in the election of directors within any of the following ranges of such voting power:

(a) One-fifth or more but less than one-third of such voting power;

(b) One-third or more but less than a majority of such voting power;

(c) A majority or more of such voting power. A bank, broker, nominee, trustee, or other person, however, who acquires shares in the ordinary course of business for the benefit of others in good faith and not for the purpose of circumventing section 1701.831 [1701.83.1]

make a "control share acquisition" must deliver to the issuer an "acquiring person statement" which contains the following information: (1) the identity of the acquiring person, (2) a statement that the "acquiring person statement" is given pursuant to section 1701.831, (3) the numbers of shares of the Ohio corporation owned by the acquiring person, (4) the range of voting power the acquiring person would obtain as a result of the acquisition, (5) a description of the proposed acquisition, and (6) representations of the acquiring person, together with a statement in reasonable detail of the facts upon which they are based, that the proposed acquisition, if consummated, will not be contrary to law, and that the acquiring person has the financial capacity to make the acquisition. Ohio Rev.Code § 1701.831(B). Within ten (10) days after the Ohio corporation receives the "acquiring person statement," it must call a special meeting of shareholders to vote on the proposed acquisition. The meeting must be held within fifty (50) days after receipt of the statement unless a different date is agreed to by the corporation and acquiring person. Ohio Rev.Code § 1701.831(C). Notice must be given to all shareholders and must include a copy of the "acquiring person statement" and a statement by the Ohio corporation of its position or recommendation. Ohio Rev. Code § 1701.831(D). The acquiring person may make the "control share acquisition" on the occurrence of two events: (1) the shareholders at the special meeting at which a quorum is present authorize the acquisition by (a) an affirmative vote of a majority of the voting power and (b) an affirmative vote of a majority of the portion of such voting power excluding the voting power of interested shares; and (2) the acquisition is consummated, according to its terms, not later than 360 days following shareholder authorization. Ohio Rev. Code § 1701.831(E). The statute does not apply to an acquisition that occurs by operation of the laws of intestate succession, through satisfaction of a pledge or other security interest, or, as the result of a merger or consolidation effected in compliance with Ohio law. Ohio Rev.Code § 1701.01(Z)(2).[14] Additionally, the statute permits the Ohio corporation, either by its articles or regulations, to elect that the statute not apply to control share acquisitions of shares of the Ohio corporation. Ohio Rev.Code § 1701.831(A).

It is undisputed that defendant Aeronca has not waived the provisions of the statute in its articles or regulations and that if

of the Revised Code shall be deemed to have voting power only of shares in respect of which such person would be able to exercise or direct the exercise of votes without further instruction from others at a meeting of shareholders called under section 1701.831 [1701.-83.1] of the Revised Code.

**14.** Ohio Rev.Code § 1701.01(Z)(2). Definitions. As used in sections 1701.01 to 1701.98 of the Revised Code, unless the context otherwise requires:

(Z)(2) The acquisition of any shares of any issuing public corporation does not constitute a control share acquisition for the purpose of section 1701.831 [1701.83.1] of the Revised Code if the acquisition is consummated in any of the following circumstances:

(a) Prior to November 19, 1982;

(b) Pursuant to a contract existing prior to November 19, 1982;

(c) Pursuant to the laws of descent and distribution;

(d) Pursuant to the satisfaction of a pledge or other security interest created in good faith and not for the purpose of circumventing section 1701.831 [1701.83.1] of the Revised Code;

(e) Pursuant to a merger or consolidation effected in compliance with section 1701.78 or 1701.79 of the Revised Code if the issuing public corporation is a party to the agreement of merger or consolidation.

The acquisition by any person of shares of an issuing public corporation in a manner described under this division shall be deemed to be a control share acquisition authorized pursuant to section 1701.831 [1701.83.1] of the Revised Code within the range of voting power under division (Z)(1)(a), (b), or (c) of this section that such person is entitled to exercise after such acquisition, provided that, in the case of an acquisition in a manner described under division (Z)(2)(c) or (d) of this section, the transferor of shares to such person had previously obtained any authorization of shareholders required under section 1701.831 [1701.83.1] of the Revised Code in connection with such transferor's acquisition of shares of the issuing public corporation.

section 1701.831 were held to be constitutional it would be applicable to the plaintiff's present tender offer. It is also undisputed that plaintiff's present tender offer is subject to the provisions of federal law and specifically to the provisions of The Williams Act and the regulations of the Securities and Exchange Commission promulgated thereunder.

## VIII. THE WILLIAMS ACT

The Williams Act was enacted by Congress in 1968 and amended Sections 13 and 14 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f). It was the "congressional response to the increased use of cash tender offers in corporate acquisitions, a device that had 'removed a substantial number of corporate control contests from the reach of existing disclosure requirements of the federal securities laws.' *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 22 [97 S.Ct. 926, 939, 51 L.Ed.2d 124] (1977)." *MITE,* 457 U.S. at 632, 102 S.Ct. at 2635.

The Act and the regulations promulgated thereunder require the offeror, upon the commencement of a tender offer, to disclose certain information to the Securities and Exchange Commission, shareholders of the target company, and the target company. 15 U.S.C. § 78n(d)(1). It requires that the offer remain open for not less than twenty business days. 17 C.F.R. 240.14e–1(a). It permits investors who tender their shares to withdraw them during the first fifteen days of the offer or at any time after sixty days from the commencement of the offer if the offeror has not yet purchased them. 15 U.S.C. § 78n(d)(5). If an offer is for less than all of the outstanding shares, and more than the requested shares are tendered, the offeror must purchase the shares on a pro rata basis. 15 U.S.C. § 78n(d)(6). All shares tendered must be purchased for the same price, and if an offering price is increased, those who have already tendered receive the benefit of the increase. 15 U.S.C. § 78n(d)(7).

Plaintiff has made a cash offer for any and all shares of defendant Aeronca's common stock. Under the Williams Act and federal regulations promulgated thereunder, plaintiff would be permitted to begin taking down shares on the sixteenth business day after the commencement of the tender offer, *i.e.,* June 12, 1986.

## IX. THE SUPREMACY CLAUSE

The first requirement of a preliminary injunction is a showing by the movant of a strong or substantial likelihood or probability of success on the merits. *Mason County Medical Association,* 563 F.2d at 260–62. To show a likelihood of prevailing on the merits, the movant "must show the likely existence of a constitutional violation causally related to the result sought to be enjoined." *Martin-Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 565 (6th Cir. 1982). Plaintiff contends that the OCSAA is preempted by the Williams Act because it radically upsets the balance Congress sought to maintain between the offeror and the target company by undercutting the Williams Act time periods, thereby creating delay which favors incumbent management. Defendants have argued that the OCSAA does not conflict with the time requirements of the Williams Act and, in fact, that it furthers the objective of the Williams Act by providing additional protection to shareholders of Ohio corporations.

The Supremacy Clause of Article VI to the United States Constitution provides, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the land ..., any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." A finding of federal preemption will not be made absent a showing that this was the clear and manifest purpose of Congress. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Congressional intent, however, may be express or implied. *Id.* at 236, 67 S.Ct. at 1155; *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 633–34, 93 S.Ct. 1854, 1859–60, 36 L.Ed.2d 547 (1973).

It will also be found where compliance with both federal and state legislation is a physical impossibility, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or when the state statute stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). In making its decision, the Court must look to the language of the federal legislation not only as it is written, but as it is interpreted and applied. *Jones v. Rath Packing Co.*, 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977).

The OCSAA was enacted by the Ohio General Assembly, effective November 19, 1982, in response to the Supreme Court decision of *Edgar v. MITE*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Although it encompasses other share acquisitions, it is specifically directed to the issue of tender offers. Ohio Rev.Code § 1701.-832.[15] In *MITE* the Supreme Court was called upon to decide whether the Illinois Business Takeover Act was preempted by the Williams Act and whether it was violative of the Commerce Clause. *Id.* at 630, 102 S.Ct. at 2634. A plurality of the Court found the Illinois statute unconstitutional under the Supremacy Clause as frustrating the objectives of the Williams Act in some substantial way. *Id.* at 630–31, 102 S.Ct. at 2634–35. A majority of the Court found the Act unconstitutional under the Commerce Clause as imposing an impermissible burden on interstate commerce in relation to the local interests served. *Id.* at 643, 102 S.Ct. at 2641. The issue which must be resolved by this Court is whether the OCSAA has overcome the infirmities recognized by the Supreme Court in the earlier "first generation" takeover statutes.

Congress has not explicitly prohibited states from regulating takeovers. *See* 15 U.S.C. § 78bb(a). Rather, the issue of whether the OCSAA is preempted by the Williams Act is one left to the courts. *MITE*, 457 U.S. at 631, 102 S.Ct. at 2634.

The decision requires a careful analysis of the federal and state legislation.

The intent of Congress in enacting the Williams Act was to "insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information...." *Piper*, 430 U.S. at 35, 97 S.Ct. at 946 (quoting *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975)). The legislative history of the Act reflects a concern by Congress that this information be provided to the shareholder in a neutral setting that favors neither management nor the takeover bidder. Congress took extreme care to avoid "tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid." H.R.Rep. No. 1711, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad. News 2811, 2813. As the Sixth Circuit Court of Appeals pointed out in *Martin-Marietta Corp.*, 690 F.2d at 567–68:

> It is clear that in filling the gap, Congress intended that the Williams Act protect investors. It is equally clear, however, that Congress adopted a 'Market Approach,' as opposed to a 'Fiduciary Approach,' in its effort to protect the investor.
>
> The function of federal regulation is to get information to the investor by allowing both the offeror and the incumbent managers of a target company to present fully their arguments and then to let the investor decide for himself.
>
> *Attorney General v. Beta-X Corp.*, 103 Mich.App. 51, 55, 302 N.W.2d 596 (1981), *leave to appeal granted*, 412 Mich. 853, 312 N.W.2d 152 (1981), quoting *Great Western United Corp. v. Kidwell*, 577 F.2d 1256, 1276 (5th Cir.1978), *rev'd on other grounds sub nom. Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979).
>
> The reason for this approach was congressional recognition that tender offers often benefit an investor and that

**15.** See n. 11, *supra*.

a statute preventing tender offers could harm, rather than protect, investors.

*Id.*, quoting S.Rep. No. 550, 90th Cong., 1st Sess. at 3 (1967) (Senate Report); H.R.Rep. No. 1711, 90th Cong., 2d Sess. at 3 (1968) (House Report); U.S.Code Cong. & Admin.News 1968, p. 2811 (footnotes omitted). Neither favoring incumbent management nor the takeover bidder, Congress adopted a policy of "even-handedness," thereby permitting the investor to make his own independent but informed decision whether to sell. *Piper v. Chris-Craft Industries*, 430 U.S. at 31, 97 S.Ct. at 944. As set forth in H.R.Rep. No. 94–1373, 94th Cong., 2d Sess. 12 (1976), the basic purpose of the Williams Act is "to maintain a neutral policy towards cash tender offers, by avoiding lengthy delays that might discourage their chances for success." "According to the Securities and Exchange Commission, delay enables a target company to: (1) repurchase its own securities; (2) announce dividend increases or stock splits; (3) issue additional shares of stock; (4) acquire other companies to produce an anti-trust violation should the tender offer succeed; (5) arrange a defensive merger; (6) enter into restrictive loan agreements; (7) institute litigation challenging the tender offer." *MITE, supra*, 457 U.S. at 638 n. 13, 102 S.Ct. at 2638 n. 13.

*See also Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 55 (2d Cir.1985); *National City Lines, Inc. v. LLC Corp.*, 687 F.2d 1122, 1129 (8th Cir.1982); *Great Western United Corp. v. Kidwell*, 577 F.2d 1256, 1276 (5th Cir.1978), *rev'd on venue grounds sub nom., Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979); *APL Limited Partnership v. Van Dusen Air, Inc.*, 622 F.Supp. 1216, 1220 (D.Minn.1985). Accordingly, although the primary purpose of the Williams Act is disclosure to the shareholder in the takeover setting, it was also the "expressed legislative intent ... to preserve a neutral setting in which the contenders could fully present their arguments."

*Schreiber v. Burlington Northern, Inc.*, —— U.S. ——, 105 S.Ct. 2458, 2463, 86 L.Ed.2d 1 (1985).

An analysis of the OCSAA convinces this Court that it frustrates the objectives of the Williams Act in a substantial manner. First, it permits delay in the take down of the tendered shares beyond the time frame set forth in the Williams Act. Second, it impermissibly tips the scales in favor of incumbent management by requiring a shareholder vote which, as counsel for defendant Aeronca agreed, will usually compel the offeror to engage in a proxy fight in the hope of being able to complete its tender offer. Third, it prevents the individual investor from deciding whether to sell his or her stock to the offeror and places the decision in the hands of other shareholders of the target company.

**A. CREATION OF DELAY IN RIGHT TO PURCHASE TENDERED SHARES**

Although the Williams Act does not require an offeror to purchase tendered shares on a specific date, the Williams Act and regulations promulgated thereunder permit plaintiff to begin purchasing shares on the sixteenth business day following the commencement of the tender offer. Under the OCSAA, however, the right of the offeror to purchase and the right of the stockholder to sell to the offeror under federal law are thwarted, and the purchasing date can be delayed by the management of the target company as long as fifty days following the commencement of the tender offer. Applied to the present case, this means that under the Williams Act and federal regulations promulgated thereunder plaintiff could begin purchasing shares on June 12, 1986. Under the OCSAA, assuming a shareholders' meeting is held promptly, that the shareholders approve the tender offer, that a tabulation of votes occurs on the same day, and that no one contests the vote, plaintiff's ability to purchase the stock would be delayed until July 10, 1986. Although defendants argue that the shareholder meeting can be held

and a decision reached prior to the sixty day period set forth in the Williams Act when a shareholder can again withdraw his unpurchased shares, this does not resolve the problem of permitting incumbent management a long period of delay in which defensive measures can be taken to thwart the acquisition of stock by the offeror.

Congress "recognized that delay can seriously impede a tender offer" and sought to avoid this problem. *MITE*, 457 U.S. at 637–38, 102 S.Ct. at 2638. As was stated by the Seventh Circuit in *Dynamics Corp. of America v. CTS Corp.*, 794 F.2d 250, 262, (7th Cir. 1986), which found the Indiana control share acquisition statute to be preempted by the Williams Act, "[I]f the Williams Act is to be taken as a congressional determination that a month (roughly) is enough time to force a tender offer to be kept open, 50 days is too much; and 50 days is the minimum under the Indiana Act if the target company so chooses." Congress also recognized the consequences of delay when it enacted the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 12 *et seq.:*

> [I]t is clear that this short waiting period [the 10 day period for proration provided in § 14(d)(6) of the Securities Exchange Act of 1934 which applies only after a tender offer is commenced] was founded on congressional concern that a longer delay might unduly favor the target firm's incumbent management and permit them to frustrate many pro-competitive cash tenders. This ten-day waiting period thus underscores the basic purpose of the Williams Act to maintain a neutral policy towards cash tender offers, by avoiding lengthy delays that might discourage their chances for success.

H.R.Rep. No. 94–1373, 94th Cong., 2d Sess. 12, *reprinted in* 1976 U.S.Code Cong. & Ad.News 2637, 2644.

Similarly, the lengthy delay required by the OCSAA undermines the basic policy of the Williams Act to maintain a neutral policy towards cash tender offers and tilts the carefully balanced scales in favor of incumbent management. In its brief, the state defendants argue that the fifty day time period in which to call a meeting is reasonable because it allows "sufficient time to prepare the necessary proxy solicitation materials; receive SEC clearance of these materials, 17 C.F.R. § 240.14a–6; distribute the proxy materials to the shareholders; and allow the shareholders sufficient time to read the materials and return their proxies." Brief of state defendants at pp. 70–71. This time period also provides incumbent management, of course, with additional time in which to defeat the tender offer. While the offeror is forbidden from acquiring any stock, there is no provision in the OCSAA barring the target company from taking defensive measures, including reacquiring its own stock. *See* Ohio Revised Code § 1701.47(C). As recognized by the Court in *MITE:*

> In the case of cash tender offers, more so than in other mergers, the equities include time and the danger of undue delay.... Lengthier delays will give the target firm plenty of time to defeat the offer, by abolishing cumulative voting, arranging a speedy defensive merger, quickly incorporating in a state with an antitakeover statute, or negotiating costly lifetime employment contracts for incumbent management. And the longer the waiting period, the more the target's stock may be bid up in the market, making the offer more costly—and less successful. Should this happen, it will mean that the shareholders of the target firm will be effectively deprived of the choice that cash tenders give to them: Either accept the offer and thereby gain the tendered premium, or reject the offer.

*MITE*, 457 U.S. at 638, n. 14, 102 S.Ct. at 2638, n. 14 (quoting 12 Cong.Rec. 30877 (1976)).

## B. IMPOSITION OF BURDENS ON OFFEROR BY A REQUIRED SHAREHOLDER VOTE OF APPROVAL

The OCSAA not only causes delay by its time requirements but, by requiring an af-

firmative vote of the shareholders of the target company, it realistically converts a tender offer into a proxy contest before the offeror will be able to purchase tendered shares.[16] Requiring an offeror to run the gauntlet of not only pursuing its tender offer but facing the probability of a proxy contest with its additional expense and potential for delays in announcing the shareholder vote, adjournments, vote challenges and similar procedural tactics, not only raises the possibility of an offeror being unable to complete the Ohio process prior to the 60 day withdrawal period, but may discourage offerors from pursuing tender offers and/or, at the least, imposes upon the offeror an additional costly and time consuming burden in connection with cash tender offers.[17] *See also Kennecott Corp. v. Smith,* 637 F.2d 181, 188–89 (3d Cir. 1980). This is contrary to the congressional intent of preserving a neutral setting in a takeover situation, *see Schreiber,* 105 S.Ct. at 2463, and impermissibly tips the scales in favor of incumbent management.

Although the original Williams Act legislation was pro-management, subsequent committee hearings recognized that takeover bids could often serve a useful function and that entrenched management tended to be successful in fending off possibly beneficial takeover attempts. *Piper,* 430 U.S. at 30, 97 S.Ct. at 943. *See also Dynamics Corp. of America, supra,* at pp. 262–263. Congress therefore made it "crystal clear that a major aspect of the effort to protect the investor was to avoid favoring either management or the takeover bidder." *MITE,* 457 U.S. at 633, 102 S.Ct. at 2636. The process envisioned under the OCSAA fails to maintain this evenhanded balance.

## C. DEPRIVAL OF SHAREHOLDER'S INDEPENDENT DECISION TO SELL TO OFFEROR

The "function of federal regulation is to get information to the investor by allowing both the offeror and the incumbent managers of a target company to present fully their arguments *and then to let the investor decide for himself." Great Western United Corp.,* 577 F.2d at 1276 (emphasis added); *MITE,* 457 U.S. at 639, 102 S.Ct. at 2639 ("Congress intended for investors to be free to make their own decisions."); *Martin-Marietta Corp.,* 690 F.2d at 567 (Congressional policy is to permit the investor "to make his own independent but informed decision whether to sell.") Rather than permitting the investor to make his or her own independent decision in a neutral atmosphere, the OCSAA requires the investor to be bound by the collective decision of other shareholders of the target company. This same concern was recognized by the court in *Icahn, supra,* holding the Missouri Control Share Acquisition Act invalid under the Supremacy Clause. As in the case of the Missouri Act, the OCSAA not only applies to tender offers but to any acquisition which would permit the offeror to exercise a given level of voting power. Although

---

**16.** At the hearing, counsel for defendant Aeronca conceded this effect:

JUDGE: I'm not referring to completion under the Williams Act in the sixty day period at all. I'm not referring to that. My question was simply as a practical matter the operation of the Ohio law in the event that the management would not approve of the offer would result in a proxy fight for the vote of the shareholders.

MR. HALL: I think I probably couldn't disagree with that, Your Honor. I would say that I think that's probably a good thing. I think that maybe that the Williams Act in its purpose of advising shareholders and informing them before they are required to take this curbside offer for their shares ought to be informed of the nature of the transaction,

what's being offered and what the alternatives are.

**17.** The Court notes that the OCSAA also modified O.R.C. § 1701.48 governing voting by proxy at shareholder meetings. Although prior law had permitted the proxy to be irrevocable when coupled with an interest, the amendment now requires proxies in connection with a vote on a control share acquisition to be revocable in all cases. Additionally, the proxies must be solicited in a manner divorced from the actual tender. *See* O.R.C. § 1701.48. This means that the offeror would be required to make two solicitations—one for the tender and one for the authorization of proxies. *See generally* Kreider, *Fortress Without Foundation? Ohio Takeover Act II,* 52 Cin.C.Rev. 108 (1983).

the statute in *Icahn* required a super-majority vote, as compared to the two-tiered majority vote requirement in the OCSAA, the analysis is the same:

> Section 13 of the Williams Act and the implementing regulations do not limit the number of shares that can be acquired by means of open market purchases or establish any timetable for acquiring shares. Furthermore, a shareholder in the target company was to be left free to make an informed choice whether to sell and obtain the benefit, if any, of the demand for the shares created by the purchaser.
>
> Missouri's control share acquisition procedures interfere directly with the § 13 approach by preventing a person seeking a control share acquisition from buying shares on the open market until shareholder approval has been obtained. Also, whether a shareholder would ever be able to sell into a market influenced by the presence of the purchaser would not depend on the investor's informed decision, but on the decision of a super-majority of all shareholders of the target company. Thus, deciding whether to buy or to sell would be taken out of the hands of the shareholder and the purchaser and placed in the hands of management and other shareholders.

*Icahn*, 612 F.Supp. at 1420.

Accordingly, because the Ohio Control Share Acquisition Act, Ohio Rev.Code § 1701.831, forces delay in the acquisition of shares in a tender offer contrary to the Williams Act, places unreasonable burdens on the offeror in obtaining the right to purchase shares, and denies to a shareholder the ability to make an independent decision to sell or not to sell to the offeror, it conflicts with and frustrates the objectives of the Williams Act. The Court therefore finds it to be invalid under the Supremacy Clause.

## X. THE COMMERCE CLAUSE

Plaintiff also contends that it is entitled to a preliminary injunction against any attempt by the defendants to enforce section 1701.831 on the ground that the OCSAA violates the Commerce Clause of the United States Constitution. Plaintiff argues that the OCSAA violates the Commerce Clause because it is an attempt by Ohio to impose a direct regulation on interstate commerce. In addition, plaintiff submits that the OCSAA does not serve any legitimate local objective that is sufficient to outweigh the excessive burden on interstate commerce imposed by the OCSAA.

The state defendants argue that the OCSAA is a constitutional exercise of Ohio's power to regulate its corporations' internal affairs and to protect shareholders of Ohio corporations. The state contends that it has decided that control of a corporation is a corporate asset, the sale of which profoundly affects internal corporate affairs and corporate governance; consequently, the state argues that it may provide a framework for the orderly disposition of tender offers similar to the system used for mergers, consolidations, liquidations, and other organic changes in corporate structure. Further, the state defendants argue that the power to regulate the internal affairs of an Ohio corporation necessarily includes the power to regulate shareholders of an Ohio corporation, in their capacity as shareholders, regardless of where those shareholders reside. Finally, the state defendants submit that the OCSAA regulates in an area traditionally left to the states and only incidentally infringes on interstate commerce, so that the statute does not violate the restrictions imposed by the Commerce Clause.

Defendant Aeronca contends that the Court should apply a deferential standard of review since the statute involves issues of corporate governance that are local in nature. Under this deferential standard, Aeronca argues that since the state acted pursuant to a permissible purpose, *i.e.*, the regulation of internal corporate affairs, and since the statute is not "wholly irrational" in light of this purpose, the Court cannot find that the statute is unconstitutional. Both Aeronca and the state defendants contend that under the balancing test

enunciated in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the legitimate public interests served by the OCSAA clearly outweigh any incidental effects the statute has on interstate commerce.

The Commerce Clause provides that "Congress shall have Power ... [t]o regulate Commerce ... among the several States." U.S. Const., Art. I, § 8, cl. 3. It is well established that the Commerce Clause limits the power of the States to enact legislation affecting interstate commerce. *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 35, 100 S.Ct. 2009, 2014, 64 L.Ed.2d 702 (1980); *Great Atlantic & Pacific Tea Co. v. Cottrell,* 424 U.S. 366, 370–71, 96 S.Ct. 923, 927–28, 47 L.Ed.2d 55 (1976); *Freeman v. Hewitt,* 329 U.S. 249, 252, 67 S.Ct. 274, 276, 91 L.Ed. 265 (1946); *Cooley v. Board of Wardens,* 12 How. 299, 53 U.S. 299, 13 L.Ed. 996 (1852). The Commerce Clause prohibits direct regulation of interstate commerce by any of the several States. *Southern Pacific Co. v. State of Arizona,* 325 U.S. 761, 775, 65 S.Ct. 1515, 1523, 89 L.Ed. 1915 (1945); *Shafer v. Farmers Grain Co.,* 268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925). A State may, however, exercise its regulatory power so that there is an impact on interstate commerce as a result of the regulation without violating the Commerce Clause. In such a case, a State statute is valid if it "regulates evenhandly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental ... unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Bruce Church,* 397 U.S. at 142, 90 S.Ct. at 847.

The plaintiff has shown a substantial likelihood that it will succeed on the merits of its claim that the OCSAA violates the Commerce Clause of the United States Constitution. Plaintiff Fleet has shown that the OCSAA is an attempt by Ohio to directly regulate interstate commerce in the market for a control share of an Ohio corporation. Further, plaintiff has shown that the asserted state interests supporting the statute do not outweigh the substantial burden on interstate commerce caused by the OCSAA.

## A. THE OHIO ACT AS A BURDEN ON INTERSTATE COMMERCE

The OCSAA directly regulates, and prevents if its terms are not satisfied, interstate tender offers for shares of stock of Ohio corporations and the interstate transactions associated with such tender offers. It is not disputed that in the present case plaintiff's tender offer involves interstate commerce in the purchase and sale of securities of the defendant Aeronca. Nor is it disputed that the OCSAA sets forth restrictions on plaintiff's tender offer that, in effect, prevent plaintiff from concluding interstate transactions with Aeronca shareholders who reside in Ohio *and* with Aeronca shareholders who live in other states. Until plaintiff obtains majority shareholder approval for its tender offer, it is prohibited by the OCSAA from purchasing Aeronca shares in interstate commerce in accordance with its tender offer.

The OCSAA purports to apply to plaintiff's tender offer for shares of stock of Aeronca even if not one of Aeronca's shareholders were an Ohio resident. By its terms, the OCSAA applies to every tender offer for a designated number of shares of an Ohio corporation with fifty or more shareholders that either has its principal place of business, or its principal executive offices, or substantial assets in Ohio. Ohio Rev.Code § 1701.01(Y). Thus, the OCSAA could apply to a tender offer which would not involve a single Ohio resident shareholder.

The extraterritorial reach of the OCSAA is emphasized by the fact that the statute would apply to a single sale between two individuals of twenty percent of the stock of an Ohio corporation. Section 1707.-01(Z)(1) defines a "control share acquisition" as the acquisition by any person of shares of an issuing public corporation equal to one-fifth or more of the voting power of the corporation. Thus, an individ-

ual residing in New York who owned a twenty percent interest in an Ohio corporation could not sell that interest to a California resident without being subject to the OCSAA. That single sale would require a shareholder meeting *and* shareholder approval before it could proceed. This emphasizes the direct, extraterritorial restraint on interstate commerce imposed by the OCSAA.

The OCSAA is designed to directly regulate tender offers for Ohio corporations that are initiated and consummated entirely through the channels of interstate commerce. Further, the OCSAA purports to regulate transactions occurring entirely beyond Ohio's borders; this "sweeping extraterritorial effect" and the attempt to assert extraterritorial jurisdiction over persons and property in other States renders the statute invalid as an attempt by the State of Ohio to regulate directly interstate commerce, in violation of the Commerce Clause. *MITE*, 457 U.S. at 643, 102 S.Ct. at 2641; *Southern Pacific v. Arizona*, 325 U.S. at 775, 65 S.Ct. at 1523; *Farmers Grain*, 268 U.S. at 199, 45 S.Ct. at 485; *Icahn*, 612 F.Supp. at 1415; *Martin-Marietta Corp.*, 690 F.2d at 566.

As the Seventh Circuit Court of Appeals stated, with reference to a similar statute, the Control Share Acquisition Act of the State of Indiana:

> ... the effect on the interstate market in securities and corporate control is direct, intended, and substantial; it is not merely the incidental effect of a general regulation of internal corporate governance.

*Dynamics Corporation of America, supra*, at p. 264. The OCSAA has the identical effect on interstate commerce—it is direct, intended and substantial and, contrary to the arguments of defendants, not merely an incidental effect of a general regulation of the internal affairs of Ohio corporations.

Similarly, in *MITE*, the Supreme Court pointed out that the state statute regulating tender offers in question in that case "could be applied to regulate a tender offer which would not affect a single Illinois shareholder" and concluded that the stat-

ute was "a direct restraint on interstate commerce and that it has a sweeping extraterritorial effect." *MITE*, 457 U.S. at 642, 102 S.Ct. at 2640. The same, of course, can be said with respect to the OCSAA.

**B. THE LOCAL BENEFITS OF THE OHIO ACT DO NOT OUTWEIGH THE BURDENS ON INTERSTATE COMMERCE**

The Ohio Act is also unconstitutional under the test enunciated in *Bruce Church*, 397 U.S. at 142, 90 S.Ct. at 847. This is because "even when a state statute regulates interstate commerce indirectly, the burden imposed on that interstate commerce must not be excessive in relation to the local interests served by the statute." *MITE*, 457 U.S. at 643, 102 S.Ct. at 2641.

Clearly, the OCSAA imposes a substantial burden on interstate commerce. It effectively prevents a purchaser of certain shares of stock in interstate commerce from making those purchases unless and until the requirements of the Ohio statute have been satisfied. The statutorily required shareholder vote approval may well block a nationwide tender offer for the purchase of thousands of shares of stock in interstate commerce. The plurality in *MITE* recognized the substantial effects on interstate commerce of such a result:

> Shareholders are deprived of the opportunity to sell their shares at a premium. The reallocation of economic resources to their highest valued use, a process which can improve efficiency and competition, is hindered. The incentive the tender offer mechanism provides incumbent management to perform well so that stock prices remain high is reduced. See Easterbrook & Fischel, The Proper Role of a Target's Management in Responding to a Tender Offer, 94 Harv.L.Rev. 1161, 1173–1174 (1981); Fischel, Efficient Capital Market Theory, the Market for Corporate Control, and the Regulation of Cash Tenders Offers, 57 Texas L.Rev. 1, 5, 27–28, 45 (1978); H.R.Rep. No. 94–1373, p. 12 (1976).

*MITE,* 457 U.S. at 643–44, 102 S.Ct. at 2641. Although stated in the context of a state statute that allowed a state secretary of state to block a nationwide tender offer, the observation is no less true when a state statute places that same power in a required two-tiered majority vote of shareholders which may, in the end, represent only a minority of the voting power of the corporation.

In support of the OCSAA, the State of Ohio advances two state interests that it claims justify the burden on interstate commerce imposed by the statute. First, Ohio contends that it has a legitimate state interest in regulating the internal affairs of its corporations which extends to policing any changes in corporate control caused by tender offers. Second, Ohio argues that the power to regulate the internal affairs of Ohio corporations includes the power to regulate shareholders of an Ohio corporation regardless of where they reside. Finally, Aeronca argues that the statute helps to protect the business climate of the state by protecting Ohio corporations from wholesale raids by foreign companies. It is clear to this Court, as it was in *MITE,* that these interests are insufficient to outweigh the burdens the Ohio statute imposes on interest commerce.

In the present case, Ohio argues that it is not regulating tender offers as such; instead, it is claimed that the OCSAA is designed to regulate changes in corporate control. Ohio argues that there is, in actuality, no distinction between a tender offer and a merger, consolidation, or other reorganization voluntarily undertaken by the board of directors of a corporation.

In fact, the distinction between a tender offer to purchase shares of stock and a decision by a board of directors and stockholders to change a corporate form or organization is so fundamental that it cannot be disregarded. A merger or other type of voluntary reorganization necessarily involves a basic change in the internal structure of a corporation. A tender offer does not in itself involve any corporate action or change in the internal structure of a corpo-

ration; instead it involves transactions between an interested purchaser and individual shareholders who may or may not desire to sell the respective shares of stock they own.

The same internal affairs argument advanced by the state of Ohio in the present case was advanced by the State of Illinois in *MITE* to support the constitutionality of the Illinois Takeover Statute. As the Supreme Court acknowledged in *MITE,* the internal affairs doctrine is a conflict of laws principal which recognizes that only one State should have the authority to regulate a corporation's internal affairs, so that a corporation is not subject to conflicting demands. See Restatement (Second) of Conflict of Laws § 302, comment b, pp. 307–308 (1971). While a State may thus regulate the internal affairs of a corporation, the Supreme Court found that a tender offer does *not* come within the ambit of the "internal affairs" of a corporation:

> Tender offers contemplate transfers of stock by stockholders to a third party and do not themselves implicate the internal affairs of the target company. *Great Western United Corp. v. Kidwell,* 577 F.2d, at 1280, n. 53; Restatement, *supra,* § 302, Comment e, p. 310.

*MITE,* 457 U.S. at 645, 102 S.Ct. at 2642.

In rejecting the same "internal affairs" argument made by the state defendants in the present case, the court in *Van Dusen Air, supra,* succinctly pointed out the contrast between a state's regulation of its corporations in the field of mergers and sales of assets and a state's regulation of shareholders of a corporation who desire to sell their stock. In discussing this distinction between provisions of the Minnesota Business Corporation Act (MBCA), requiring shareholder approval for a merger or sale of assets, and provisions of the Minnesota Control Share Acquisition Act (MCSAA), requiring shareholder approval for acquisition by a purchaser of more than twenty percent of the voting stock of a Minnesota corporation, the court said:

The state's merger analogy perpetuates the state's confusion between regulation of a corporation and the regulation of those who would trade in shares. One obvious difference between the MCSAA and those provisions of the MBCA requiring shareholder approval for a merger or sale of assets is that the latter only apply to Minnesota corporations. The merger provision of the MBCA restricts the ability of a *Minnesota corporation* to merge. That is a lawful exercise of the state's authority to regulate a legal entity created by state statute. While the MCSAA also applies only to Minnesota corporations, it does not purport to regulate the activities of the corporation; rather, it reaches out and regulates *shareholders* who may or may not be residents of Minnesota.

*Van Dusen Air,* 622 F.Supp. at 1224 (emphasis in original).

The distinction between tender offers and a subsequent utilization of a control share to reorganize a company was also discussed by the court in *Van Dusen Air:*

The acquisition of shares does not implicate the internal affairs of the target corporation. The use of that power *once the shares have been acquired* may well be a proper subject of state regulation.

*Van Dusen Air,* 622 F.Supp. at 1223–24 (emphasis in original).

In short, tender offers themselves do not create changes in the internal affairs of the corporation in the sense that mergers and consolidations effect such changes. If the tender offer is successful, it is true that voting control may well be changed, but the changing identity of the shareholder or shareholders owning sufficient stock to exercise control does not of itself change the nature of the corporate entity or alter its internal affairs.

Finally, as noted earlier, the effect of the OCSAA on interstate commerce is substantial and not simply incidental to the exercise of a state's power to regulate the internal affairs of its corporations. As the Seventh Circuit Court of Appeals stated, in rejecting this same "internal affairs" argu-

ment in connection with Indiana's Control Share Acquisition Act:

The Indiana statute is not saved by the "internal affairs" doctrine. This principle of conflict of laws is designed to make sure that the law of only one state shall govern the internal affairs of a corporation or other association. See *Edgar v. MITE Corp., supra,* 457 U.S. at 645 [102 S.Ct. at 2642]; Restatement (Second) of Conflict of Laws § 302 (1971). In this case the state is indeed Indiana; but it does not follow that any law which Indiana adopts that affects the internal affairs of Indiana corporations is thereby insulated from review under the commerce clause. We may assume without having to decide that Indiana has a broad latitude in regulating those affairs, even when the consequence may be to make it harder to take over an Indiana corporation; an example is a law that by requiring cumulative voting for the board of directors makes it difficult to oust the entire existing board at one fell swoop. But in this case the effect on the interstate market in securities and corporate control is direct, intended, and substantial; it is not merely the incidental effect of a general regulation of internal corporate governance. The law in question is an explicit regulation of tender offers; that the mode of regulation involves jiggering with voting rights cannot take it outside the scope of judicial review under the commerce clause. Any other conclusion would invite facile evasions of the clause.

*Dynamics Corporation of America, supra,* at p. 264.

Ohio also contends that its power to regulate the internal affairs of its corporations necessarily includes the power to govern relations between shareholders. Ohio then argues that it can govern shareholders of an Ohio corporation regardless of where those shareholders reside. In *MITE,* however, the Supreme Court expressly found that "[w]hile protecting local investors is plainly a legitimate state objective, the State has no legitimate interest in protect-

ing nonresident shareholders." 457 U.S. at 644, 102 S.Ct. at 2641. *See Dynamics Corp. of America, supra,* at p. 263; *Van Dusen Air, Inc.,* 622 F.Supp. at 1222; *Icahn,* 612 F.Supp. at 1415; *Martin-Marietta Corp.,* 690 F.2d at 566. The OCSAA clearly restricts the right of nonresidents of Ohio to sell their shares to the offeror, and the language of the Sixth Circuit Court of Appeals is equally applicable in this case:

> As to this extraterritorial effect, the provisions constitute an unconstitutional burden on interstate commerce because there exists no legitimate state interest in the protection of non-resident shareholders.

*Martin-Marietta Corp.,* 690 F.2d at 566.

Finally, Aeronca argues that the State of Ohio has a legitimate state interest in protecting its business climate and the employment of its citizens by shielding Ohio corporations from hostile tender offers by foreign corporations. Aeronca points to the substantial contribution its operations make to the area of Middletown, Ohio, where its manufacturing plant is located. Aeronca argues that plaintiff's last acquisition resulted in the closing of the United States operations of the target company, implying that if plaintiff succeeds in its tender offer the Ohio plant may be closed. This argument can be easily dismissed. It is based upon speculation that any person who acquires twenty percent of the voting stock of an Ohio corporation will probably attempt some action harmful to Ohio's business climate, including, in the context of Aeronca's argument, the closing of an Ohio plant with resulting loss of employment by Ohio residents. There is nothing before the Court that would permit a finding to be made that such a result is likely to occur. Furthermore, any legislative attempt by Ohio to control or restrict the ownership of stock of a corporation by regulating the interstate sale of that stock in order to prevent a new owner from closing an Ohio plant or transferring assets elsewhere would clearly be an unconstitutional interference with interstate commerce. The Court notes, too, that the OC-

SAA does not attempt to place any restrictions upon Aeronca's current management in terms of its ability to move its Ohio plant elsewhere, perhaps to North Carolina where Aeronca's principal executive offices are located, or to simply close its Ohio plant.

In sum, the local interests asserted by the defendants to support section 1701.831 do not outweigh the substantial burden imposed on interstate commerce by the statute; accordingly, under the analysis of *Bruce Church,* section 1707.831 is an unconstitutional exercise of state legislative power.

## XI. CONCLUSION

Having determined that plaintiff has sustained its burden of establishing a substantial likelihood of success on the merits in showing that the Ohio Act is unconstitutional, it is the further opinion of this Court that it has established the remaining three prerequisites for the issuance of a preliminary injunction. "In the context of a tender offer, time is of the essence ..." *Martin-Marietta Corp.,* 690 F.2d at 568, and subjecting plaintiff Fleet to the unconstitutional requirement of the OCSAA with its inherent ability to delay, amounts to irreparable harm. *Id.* Furthermore, the purported interest of the state in regulating the internal affairs of Ohio corporations and protecting shareholders, many of whom may not even be Ohio residents, cannot be elevated above the objectives of the Williams Act or the constitutional requirement that interstate commerce be not unduly burdened by any state. Nor does defendant Aeronca have any right to the unconstitutional application of state law. *Id.* When balancing the harm to plaintiff if the injunction is denied against the possible harm to be suffered by defendants, the balance is clearly in plaintiff's favor. Finally, the public interest would also best be served by granting the injunction. "It is in the public interest not to perpetuate the unconstitutional application of a statute." *Id.*

Accordingly, defendant Aeronca's motion for a preliminary injunction is DENIED. Plaintiff Fleet's motion for a preliminary injunction is GRANTED. Defendants are ENJOINED until further order of this Court from taking any action whatsoever to invoke, enforce or apply the provisions of Ohio Rev.Code § 1701.831 against plaintiff in connection with plaintiff's tender offer for shares of common stock of defendant Aeronca.

The security previously given by plaintiff for the issuance of the temporary restraining order shall remain as the security for the issuance of this preliminary injunction.

IT IS SO ORDERED.